

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 1:12-CR-474-CMH |
| v. | ) | |
| | ) | |
| JULIO CESAR REVOLORIO RAMOS, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The United States of America and the defendant, Julio Cesar Revolorio Ramos, agree that had this matter proceeded to trial, the United States would have proven beyond a reasonable doubt the following facts:

1. In and around January 2009, in Fairfax County and elsewhere, in the Eastern District of Virginia and elsewhere, defendant JULIO CESAR REVOLORIO RAMOS, aided and abetted by others, did knowingly recruit, entice, harbor, transport, provide, and obtain a girl, "EA," who had not attained the age of eighteen years, in and affecting interstate commerce, knowing and in reckless disregard of the fact that EA had not yet attained the age of eighteen years, and the defendant knowingly caused EA to engage in a commercial sex act.

2. Defendant Julio Cesar Revolorio Ramos (hereinafter "Ramos") is an illegal alien and a citizen of Guatemala.

3. From at least June 2008 through September 4, 2012, Ramos was involved in a prostitution business in which he and others prostituted primarily Hispanic women and girls—most of whom were illegal aliens—in Maryland, Delaware, the District of Columbia, and Virginia.

4. Ramos and co-conspirators advertised the prostitution business by handing out business cards that purported to be for plumbing, landscaping, or snow removal business, but which contained a telephone number a customer could call to obtain sexual services from a prostitute. Ramos and co-conspirators would hand out these business cards to illegal aliens and those congregating at sites for day laborers, such as 7-Eleven stores. Ramos also distributed business cards at Hispanic restaurants and check cashing stores in Virginia. In addition, Ramos asked women and girls that he prostituted to distribute the business cards to customers. Through this advertisement, over time, Ramos obtained a group of regular, prostitution customers.

5. Ramos and his co-conspirators recruited women and girls to serve as prostitutes.

6. Ramos drove women and girls from Maryland to various locations in the Eastern District of Virginia for the purposes of performing acts of prostitution.

7. "EA" is a woman who was born in 1993. Around January 2009, when EA was fifteen years old, she was a runaway staying with a man in Maryland who demanded rent from her. A co-conspirator of Ramos spoke to EA, suggested to EA that prostitution was a great way to make money, and told EA that EA could work as a prostitute for Ramos. Ramos also spoke with EA on the telephone and encouraged her to work as a prostitute.

8. Around January 2009, for about three days, Ramos prostituted EA in various places in the Eastern District of Virginia after driving EA from Maryland to Virginia.

9. As instructed by Ramos and a co-conspirator, EA charged customers $30 for fifteen minutes of sexual intercourse or oral sex. Ramos provided EA with condoms and lubricant and drove her to various apartments and homes in the Eastern District of Virginia for

sex with customers. While driving, Ramos talked on his cellular telephone with potential customers and encouraged them to pay to have sex with EA.

10. Ramos also instructed EA not to use her real name and not to carry any identification documents on her. Ramos told EA that, if she were ever caught by the police, she should not implicate or even mention Ramos, but should lie by saying that the customer was her boyfriend.

11. On the first day that Ramos prostituted EA, EA had sexual relations with around 17 customers. Most of the customers were illegal aliens. Although EA was sore and was crying, Ramos instructed EA to continue having sex with customers. Ramos paid EA $15 for each customer with whom she had sex.

12. On the third day that Ramos prostituted EA, EA had sexual relations with approximately 25 customers. Ramos had arranged for EA to have sex with even more customers, but EA's body could not withstand sex with additional customers. After the sixteenth customer, EA asked to stop, but Ramos pushed her to take on more customers and EA felt compelled to do so. After having sex with the 25th customer, however, EA was crying and refused to service any more customers.

13. EA did not work for Ramos again until June 2010, when EA called a co-conspirator of Ramos. That co-conspirator invited EA to live in the basement of the house in Adelphi, Maryland that the co-conspirator shared with Ramos and Ramos's sister.

14. In June 2010, one week after EA moved in with Ramos, Ramos prostituted EA for seven days, from Monday until Saturday of the following week. Ramos prostituted EA in Alexandria, Falls Church, and Tyson's Corner, Virginia, among other places. As before,

customers were charged $30 for fifteen minutes of sex, and Ramos promised to pay EA half of the money collected. Ramos paid EA approximately $1,200 for the seven days that he prostituted her.

15. To ensure that the customers had new women for sex, Ramos typically would prostitute a particular woman or girl for a six-day period, usually beginning on Monday and ending on Saturday of the following week. At the end of the six-day period, Ramos usually would prostitute a different woman or girl than the one he had prostituted the week before.

16. In July 2010, Ramos again prostituted EA in the Eastern District of Virginia.

17. When Ramos was prostituting EA, Ramos knew that EA was less than eighteen years of age. When describing EA to potential customers on the telephone, Ramos described EA as "young," and Ramos knew that EA was popular with the customers because of her youth. Indeed, several customers repeatedly requested EA because of her age.

18. Around June 2010, a co-conspirator of Ramos informed EA that on weeks when EA was not being prostituted by Ramos, EA could make money being prostituted by other co-conspirators. So, from around June 2010 to December 2010, during weeks that Ramos was prostituting other women and was not prostituting EA, co-conspirators and others prostituted EA in Virginia, Maryland, and the District of Columbia.

19. Besides EA, co-conspirators of Ramos prostituted hundreds of women, and other underage girls, in Virginia, Maryland, and the District of Columbia.

20. Ramos received a share of the prostitution proceeds earned by the particular woman or girl Ramos prostituted on a particular week. Another portion of the proceeds was paid to MS-13 gang members who extorted "rent" from Ramos's co-conspirators via threats of

violence. Yet another portion of the proceeds was conveyed via Western Union and MoneyGram to co-conspirators located in Mexico.

21. Ramos initially was part of a multi-state conspiracy that prostituted women and girls in Delaware, Maryland, Virginia, and the District of Columbia. In that conspiracy, Ramos's primary role was to drive women from Maryland to Virginia for purposes of them having commercial sex, and to collect the proceeds of the prostitution. At some point after 2010, however, Ramos worked primarily for himself prostituting women and girls.

22. The acts taken by the defendant in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law and were not committed by mistake, accident, or other innocent reason. The defendant further acknowledges that he is obligated under his plea agreement to provide additional information about this case beyond that which is described in this Statement of Facts.

23. The Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against the defendant regardless of whether the plea agreement is presented to or accepted by a Court. Moreover, the defendant waives any rights that the defendant may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.

24. This Statement of Facts includes those facts necessary to support the plea agreement between the defendant and the government. It does not include each and every fact

known to the defendant or the government, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: _____
Marc J. Birnbaum
Special Assistant United States Attorney (LT)

_____
Michael J. Frank
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proven the same beyond a reasonable doubt.

_____
Julio Cesar Revolorio Ramos
Defendant

I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

_____
Mr. Daniel T. Lopez, Esquire
Counsel for the Defendant